UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARION MISIAK and MARY BETH MISIAK, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> MORRIS MATERIAL HANDLING, INC, et al., ) <br> ) <br> Defendants. ) | No. 07 C 6330 <br><br> Judge John W. Darrah |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Marion Misiak ("Misiak") and his wife, Mary Beth Misiak, brought suit against Defendant, Morris Material Handling, Inc. ("Morris"), after a crane, which had recently been inspected and repaired by Morris, failed, dropping a 1,200 lb. load onto Misiak. Before the Court is Defendant's motion for summary judgment.

## **BACKGROUND**

In November 2006, Misiak was an employee of Union Tank Car Company ("Union Tank") and worked at Union Tank's plant in East Chicago, Indiana. (Def.'s 56.1(a)(3) ¶ 2.) Morris provides crane service and maintenance. (Pls.' 56.1(b)(3)(C) ¶ 1.) From November 3 through November 7, 2006, employees of Morris performed work on a crane located at the Area 391 Jacket Shop in Union Tank's plant in East Chicago, Indiana. (Def.'s 56.1(a)(3) ¶¶ 11, 19, 28.) On November 7, 2006, during the first high lift performed by the crane after Morris had turned the crane over to Union Tank, the wire rope of the crane broke, dropping the crane's load onto Misiak. (*Id.* ¶¶ 37, 39, 40.)

The crane at issue is an industrial overhead crane located in a machine shop. (*Id.* ¶¶ 6, 7.) Through use of a pendant controller, which hangs down from the crane to the machine shop

floor, the crane's operator can use the crane to raise and lower heavy loads and to move them anywhere in the machine shop that is within range of the crane. (*Id.* ¶ 7.) The crane has bridge girders that span the width of the machine shop. (*Id.* ¶ 7.) Both ends of the bridge girders are supported by "end trucks," which can move back and forth along the length of the machine shop. (*Id.* ¶ 7.) A trolley, which runs back and forth along the bridge girders, contains a hoist motor and a hoist drum. (*Id.* ¶ 7.) A wire rope and hook block are lowered from the trolley. (*Id.* ¶ 7.)

Central to this case, the trolley also contains a "limit switch." (*Id.* ¶ 7.) The function of the limit switch is to prevent a "two blocking" incident. (*Id.* ¶ 10.) A two-blocking incident occurs when the hoist block is raised too high and comes in contact with the underside of the crane. (*Id.* ¶ 9.) A two-blocking incident frequently results in the wire rope breaking and the hook block and any load falling to the ground. (*Id.* ¶ 9.) A properly functioning limit switch will turn off the hoist motor if the hook block is raised within a certain distance of the underside of the crane. (*Id.* ¶ 7.) The accident at issue in this case was caused by a two-blocking incident, which, due to reasons discussed below, was not prevented by the crane's limit switch. (*Id.* ¶ 8.)

As noted above, Morris's work on the crane began on November 3, 2006. (*Id.* ¶ 19.) During the course of the work, Morris lowered the components of the crane, including the trolley, to the ground. (*Id.* ¶ 20.) During this process, the electrical wiring, including the connection to the trolley, was disconnected. (*Id.* ¶ 21.) However, Morris did not do any work on the wiring of the trolley itself. (*Id.* ¶ 24.) Rather, while the trolley was on the ground, the Union Tank foreman instructed three or four Union Tank electricians to work on the wiring in the trolley. (*Id.* ¶ 26.) No Morris personnel changed any wiring in the limit switch. (*Id.* ¶ 32.)

2

After Morris turned the crane over to Union Tank, the crane operator, David Valdez, discovered that the crane would not go up. (*Id.* ¶ 37.) Valdez advised his foreman, and a maintenance crew at Union Tank responded and fixed the problem. (*Id.* ¶ 38.) On the first lift the crane performed, Valdez did not need to hoist very high. (*Id.* ¶ 39.) However, on the second lift, Valdez intended to lift as high as the crane would go. (*Id.* ¶ 39.) Valdez therefore had the crane hoist up, intending that the upper limit switch would stop the upward motion. (*Id.* ¶ 39.) The limit switch did not stop the upward motion, the hook block continued to rise, coming in contact with the underside of the crane, and the wire rope snapped, causing the load to fall on top of Misiak. (*Id.* ¶¶ 8, 9, 40.)

It was later determined that the limit switch was incorrectly wired; specifically, the wiring was connected to the wrong terminals such that it was "wired to the open position." (*Id.* ¶¶ 43, 45.) The effect of the limiting switch being wired in the open position is the crane can only operate in the up direction for a few feet. (*Id.* ¶ 43.) With the limit switch wired as it was – in the open position – the crane should not have been able to lift the hoist block up again once it was lowered to the ground. (*Id.* ¶ 48.)

At an inspection on November 10, 2006, three days after the accident, a photograph was taken of the wiring in the electrical control panel of the crane. (*Id.* ¶ 49.) The photograph showed that a lead had been moved, effectively removing the upper limit switch from the controls of the crane. (*Id.* ¶ 49.) With the limit switch removed from the circuit, as shown in the November 10, 2006 photograph, it could not prevent the hook block from going too far up and two-blocking. (*Id.* ¶ 51.)

On November 17, 2006, ten days after the accident, operational tests were performed on the hoist of the crane. (*Id.* ¶ 52.) During those tests, the crane initially would not hoist up. (*Id.* ¶ 52.) When it was lowered, it then would hoist up and stop in the top few feet of travel. (*Id.* ¶ 52.) However, once the hoist was lowered several more feet, it would not hoist up at all. (*Id.* ¶ 52.)

If the wiring seen in the November 10, 2006 photograph had still been in place during the November 17, 2006 tests, i.e., if the limit switch had still been removed from the circuit, the hoist would have moved freely up rather than stopping. (*Id.* ¶ 53.) The crane was not operated again until August 27, 2007, when it was necessary to jump the limit switch out of the circuit in order to have the crane hoist up. (*Id.* ¶ 57.)

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the nonmoving

party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

## ANALYSIS

Morris asserts that the undisputed facts of this case entitle it to summary judgment. According to Morris, the relevant events took place as follows. During Morris's repairs of the crane, electricians from Union Tank rewired the limit switch incorrectly. The effect of the incorrect wiring was to cause the limit switch to prevent the crane from operating in the up direction for more than a few feet of travel.

In order for the accident to have occurred, Morris argues, the limit switch must have been bypassed – that is, removed from the circuit. Indeed, the November 10, 2006 photograph, taken just three days after the accident, shows that the limit switch was bypassed. However, the bypass is difficult to see, and no one discovered the bypass until many months after the accident.

5

According to Morris, there is compelling evidence that someone at Union Tank and not an employee of Morris bypassed the limit switch. Morris notes that during the November 17, 2006 testing of the crane, the crane functioned consistently with having an incorrectly wired, non-bypassed limit switch. Morris concludes from this that whoever bypassed the limit switch prior to the accident returned at some time between the November 10, 2006 photograph and the November 17, 2006 test and removed the bypass. Morris asserts that the Morris employees who repaired the crane and turned it over to Union Tank never returned to the Union Tank facility and, therefore, that it could not have been them. Furthermore, Morris notes that all Morris employees have testified that they did not put the bypass in place.

Therefore, Morris argues, the most logical conclusion is that an unknown Union Tank electrician put the bypass in place shortly after Morris turned it over to Union Tank once it was discovered that the crane would not hoist. With the limit switch bypassed, the crane two-blocked, causing the cable to break and dropping the load on Misiak.

Misiak agrees that the limit switch was wired incorrectly and that the limit switch was bypassed at the time of the accident. However, Misiak disagrees with Morris about who was responsible for the incorrect wiring of the limit switch and the presence of the bypass. With respect to the former, Misiak cannot genuinely dispute Morris's position that a Union Tank employee wired the limit switch.[1] Therefore, the Court will consider that fact undisputed.

---

[1] In response to Morris's Local Rule 56.1 statement, Misiak admitted the following facts: Morris personnel witnessed three non-Morris personnel rewiring the trolley (Def.'s 56.1(a)(3) ¶ 24); a Union Tank foreman assigned three or four Union Tank electricians to work on the crane trolley (*Id.* ¶ 26); during cleanup, Morris personnel observed the remnants of new blue wiring at the location where the Union Tank electricians had been working on the trolley's wiring (*Id.* ¶ 27); and, after the accident, new, blue wiring was present in the limit switch (*Id.* ¶ 41). Misiak also admitted that Morris did not do any wiring on the trolley (*Id.* ¶ 24), which is the location of

Misiak's attempt to raise a genuine factual issue with respect to who installed the bypass is a different matter. Morris argues that there is compelling evidence that it was a Union Tank employee who bypassed the limit switch. Morris points out that its employees all testified that they did not install the bypass and that none of them returned to the Union Tank facility after the accident (and, thus, could not have removed the bypass between the November 10 photograph and the November 17 test.) However, neither of these observations establishes the point conclusively. First, Misiak admitted only that the Morris employees testified that they did not install the bypass, not that the testimony was truthful.[2] Thus, Misiak has not conceded this point. Furthermore, Morris's assertion that none of its employees returned to the Union Tank facility is found in its brief rather than its Rule 56.1 statement of facts. Thus, the Court cannot properly consider it an undisputed fact for purposes of this motion.[3] Finally, Misiak has offered some support for his assertion that the bypass had already been installed when Morris turned the crane over to Union Tank. During depositions, Morris employees stated that they tested the crane before turning it over to Union Tank, or at least that it would be their normal practice to do so.

---

the limit switch. Misiak purports to dispute Morris's statement of fact that nobody in the Morris crew changed the wiring in the limit switch. (*See* Pls.' 56.1(b)(3)(B) ¶ 32.) However, the testimony cited to rebut that assertion, in which a Morris technician, Ted Light, asserts that he spent an hour attempting to repair the limit switch, relates not to the wiring of the switch but to its proper adjustment. Indeed, Light testified that neither he nor anyone else rewired the limit switch. (Light Dep., p. 65.)

[2]Misiak points out that Ted Light, one of the Morris technicians who worked on the crane and has since left the company, now claims that the statement he gave to Morris after the accident was incomplete and that the two other Morris technicians' accounts of the events were not accurate.

[3]Furthermore, that none of the Morris employees who repaired the crane never returned to the Union Tank facility is relevant only if it is assumed that the same individual both installed and removed the bypass. This is a reasonable assumption, but only an assumption.

(*See* Pls.' 56.1(b)(3)(C) ¶ 5.) Had the limit switch not been bypassed at that time, the crane would not have hoisted properly during those tests.

For the above stated reasons, the Court finds that a genuine issue of material fact exists as to who bypassed the limit switch. As the parties agree that the bypass was a major cause, if not the primary cause, of the accident, a determination that Morris employees installed the bypass would likely lead to a finding of negligence.

Furthermore, even if Morris could conclusively establish that its employees had not bypassed the limit switch, it still might not avoid all responsibility for the accident. The facts presented to the Court strongly suggest that Morris turned over the crane to Union Tank with an incorrectly wired limit switch. If the bypass was not in place at the time Morris finished its repairs, results of the November 17, 2006 test would suggest that even the most cursory testing by Morris would have revealed that the crane was not functioning properly. Thus, negligence on the part of Morris might be found even if it was Union Tank employees that incorrectly wired the limit switch and later installed the bypass.[4]

Morris argues that no matter its possible negligence, the doctrine of intervening or superseding cause precludes any finding of liability on its part. Under the doctrine of intervening cause, an independent event, not reasonably foreseeable, that breaks the connection between a defendant's negligent acts and the plaintiff's injury relieves the defendant of all liability resulting from the negligent act. *Arnold v. F.J. Hab, Inc.*, 745 N.E.2d 912, 917 (Ind. App. Ct. 2d Dist.

---

[4] Alternatively, Misiak suggests that the Morris employees intended to return to finish the repairs later and failed to inform Union Tank that they had not finished their repairs and that the crane was not functioning properly. This scenario, also, could lead to the conclusion that Morris was negligent.

2001).[5] Morris first asserts that the bypass of the limit switch – by Union Tank – was an intervening cause. As the Court has found that a genuine issue of fact exists with respect to who installed the bypass, Morris cannot prevail on that basis. Morris next argues that Union Tank committed a number of safety violations that cumulatively amount to an intervening cause. Specifically, Morris asserts that (1) the electricians who rewired the limit switch should have tested it, (2) the crane operator should have tested the limit switch before putting a load on the crane, (3) the crane operator should not have used the limit switch as a control device to turn off the hoist motor, and (4) the load should not have been moved above a person. Morris's argument fails, however, because all of these safety violations, and the harm resulting from them, could be considered foreseeable. *See Beta Steel v. Rust*, 830 N.E.2d 62, 74 (Ind. App. Ct. 2005) (a subsequent act is superseding only when the harm resulting from the original negligent act could not have been reasonably foreseen by the original negligent actor). Indeed, Morris admits that the last three purported intervening causes are violations of OSHA and Union Tank's safety manual. Thus, a jury could reasonably find that there was no intervening cause between Morris's alleged negligence and the harm suffered by Misiak.

## CONCLUSION

For the reasons stated above, Morris's motion for summary judgment is denied.

Dated: December 10, 2009

JOHN W. DARRAH
United States District Court Judge

---

[5]The parties agree that Indiana law applies.